OPINION OF THE COURT
Gerard M. Weisberg, J.
This claim involves the tragic death of Beth Susan Penzell (decedent) in a motorcycle accident. Murray Penzell (claimant), her father and administrator of her estate, has brought this wrongful death action.
On the evening of June 20, 1980, at about 9:00 p.m., Ms. Penzell arrived at the home of Marc S. Dattoma in Free-port, New York. They had known each other for approximately one and one-half months prior to that date. For the next hour or so they sat and talked, Mr. Dattoma consuming approximately one-half bottle of beer and decedent one-half bottle of white wine. At about 10:10 p.m. they decided to go to a local nightspot on Mr. Dattoma’s motorcycle.
*601 They proceeded on the Meadowbrook Parkway south to Ocean Drive and then east.[1] The latter is a State highway. Mr. Dattoma was driving and Ms. Penzell occupied the passenger position behind him. Both wore helmets.
They traveled along Ocean Drive to a point approximately 1.7 miles east of Gilgo Beach. The road, located in the vicinity of Jones Beach State Park, at that point is four lanes wide. The two eastbound lanes, measuring 20 feet across, are separated from the two westbound ones by a grassy median, approximately 60 feet wide.[2]
The night was clear and dry. The roadway was lit with street lamps situated between 8 to 10 feet from its southern edge. They were riding in the left side of the left lane going between 55 and 60 miles per hour.
At trial, Mr. Dattoma testified that he hit a three-foot wide expansion joint in the roadway which caused his vehicle to leave the pavement and enter upon the median. In an interview at the accident scene, he told Robert F. Algar, an inspector for the New York State Police, that he was not paying attention to the road at that moment because he was engaged in conversation with the decedent. We conclude that this was so, and that the motorcycle left the roadway because of Mr. Dattoma’s inattentiveness.
He did not lose control of the vehicle, however.
Abutting the north side of the paved portion of the roadway was a section of the median consisting of a thin strip of hard-packed dirt. This was described by Inspector Algar at trial as being approximately three feet wide. Mr. Dattoma rode along this narrow portion of the median for 309 feet. During this time he downshifted, reduced the throttle and decelerated to between 40 and 45 miles per hour. He testified that he could not go left because that part of the median was comprised mostly of sand in which his motorcycle would have become mired. Nor could he have continued going straight, he stated, because he could *602 not see what lay ahead. He therefore decided to regain the roadway.
Assuming his average speed over the distance in question was 50 miles per hour, 4.21 seconds would have elapsed between the time he left the pavement and the time his vehicle again made contact with the blacktop.[3]
Along this stretch of road, the north edge of the asphalt and the border of the median that was immediately adjacent to it were not level with each other. The median was lower than the roadway. Thus, an exposed ledge or pavement drop-off was present alongside the entire distance of the hard-packed strip upon which Mr. Dattoma rode when he left the paved surface of Ocean Drive.
Inspector Algar who was at the site of the mishap soon after it occurred and whose investigation report is in evidence testified that at the spot the vehicle left the road the depth of the drop-off was two and one-half inches. At the point re-entry was attempted the height of the ledge was three and one-half inches. There was a gradual change from the former to the latter elevation, although in places the difference was less than two and one-half inches.
When the motorcycle carrying Mr. Dattoma and the decedent hit the three and one-half-inch ledge, it went out of control. The vehicle fell on its right side and skidded approximately 79 feet along the pavement. At some point, Ms. Penzell was thrown from her seat. She came to rest approximately nine feet west of the motorcycle’s final position.
Her skull was fractured. She died shortly thereafter without regaining consciousness. Mr. Dattoma was not seriously hurt, suffering only minor cuts and abrasions.[4]
Liability is sought to be imposed on the defendant State of New York for negligently permitting a dangerous condition to exist at the median immediately adjoining the roadway. Specifically, claimant argues that the three and óne-half-inch depression posed a foreseeable hazard to motorcycles of which defendant had notice.
*603 The presence of the condition is uncontroverted. This was verified by Alfred J. Lees of the Long Island State Parkway Police who testified for the defendant and was the police officer who responded to the accident. He stated that the three and one-half-inch ledge is the “normal” condition of the road. Moreover, he testified that the median was used regularly by motorists to stop and enjoy the beachfront view and also that the change in elevation was caused by vehicles going off the road in this recreational pursuit.
Harry Norman Babb testified as an expert for the claimant. He is a professor of criminal justice at the State University of New York at Farmingdale and a former captain of the Suffolk County Police Department. When he retired he was in command of a motorcycle squad which included 45 police officers. He is a specialist in traffic safety and has had experience designing a motorcycle practice range.
Professor Babb stated that a shoulder that is not even with the road creates a critical and dangerous situation for a traveling motorcycle. In this case, he concluded, the pavement drop-off was a contributing factor to the driver’s loss of control.
We agree and find that the ledge constituted a hazard to motorcycle traffic on this State highway which contributed to causing the accident.[5] Indeed, the unfortunate incident would not have occurred if not for its presence. Mr. Dattoma testified that he was in control of his vehicle up until the time he hit the three and one-half-inch obstruction. His account is supported by Inspector Algar’s observation that on almost the entire 309-foot portion of the hard-packed dirt over which the motorcycle traveled, its rear tire track fit into its front track. This, we find, is evidence of a forward-moving vehicle that is maintaining its stability. It was only after coming in contact with the impediment that equilibrium was lost.
Our finding that the ledge contributed to the accident does not resolve the question of liability however. The *604 State has argued that it may only be held liable if an emergency situation caused Mr. Dattoma to leave the road since only then, it is urged, was there a duty to keep the median in a reasonably safe condition.[6]
Subsequent to the submission of briefs in this case, the Court of Appeals rendered its opinion in Bottalico v State of New York (59 NY2d 303, affg 87 AD2d 807). The court there stated that “[n]o meaningful legal distinction can be made between a traveler who uses a shoulder with justification and one who uses it negligently insofar as how such conduct relates to whom a duty is owed to maintain the shoulder.” (Bottalico v State of New York, supra, p 306.)
The same reasoning should be applied to the instant case. The focus of our attention is the foreseeability that the median would be used by motorcycles, since this factor defines the duty the defendant owes. Whether careless or reasonable, the actions of a motorist which lead to his presence on the area adjacent to the road have no bearing on the State’s obligation. This was not the case prior to the introduction of comparative fault, when a driver’s emergency (i.e., nonnegligent) use of a shoulder was a prerequisite for recovery. (See, e.g., Brown v State of New York, 284 App Div 1014, affd 308 NY 980.) Then, the motorist’s actions were really “part of the issue of contributory negligence.” (Scott v State of New York, 19 AD2d 574, 575.) Currently, a claimant’s fault is relevant to apportioning liability, and does not provide defendant with a complete defense. (See Bottalico v State of New York, supra.)
It was foreseeable that there would be vehicular traffic on the portion of the median bordering the road. This is particularly true in light of its continued use for recreational purposes. We therefore hold that the State had the duty to properly maintain the area where the accident took place.
Additionally, we conclude that the area immediately adjacent to the roadway was a “shoulder.” The prospect *605 that it would be used for the purpose of “allowing distressed automobiles to move out of the flow of traffic” (Bottalico v State of New York, supra, pp 305-306) should have been perceived by the defendant. Under Bottalico the defendant was required to keep it in a reasonably safe condition, even for those who have negligently driven onto it. This obligation extended to motorcyclists. (See Coss v State of New York, 11 Misc 2d 856, affd 8 AD2d 682.)
Tomassi v Town of Union (46 NY2d 91), cited by defendant, is inapposite. Plaintiffs in that case were involved in an automobile collision whose impact sent their car into a shallow drainage ditch which ran alongside of the roadway. In concluding that the town could not be held partially liable for the presence of the gutter, the court found that the “accident was caused by the failure * * * to observe the rules of the road” and not by any negligence on the part of the municipality. (Tomassi v Town of Union, supra, p 98.) In contrast, the State’s failure in the instant case to use reasonable care in the maintenance of the shoulder to its highway was a proximate cause of the unfortunate occurrence.
The defendant also urges that Mr. Dattoma was solely responsible for the accident. This is against the weight of the evidence. True, his negligent inattentiveness caused the motorcycle to leave the road. Once on the shoulder, however, he maintained control of his vehicle. It was only after encountering the hazard caused by the State that equilibrium was lost. We cannot hold that the decision to go back on the road leading, as it did, to the impact with the ledge, was unreasonable. Mr. Dattoma had little more than four seconds to react in a situation where he could not see where he was going. In these circumstances, the choice to regain the highway was not negligent.
Where the wrongful acts of two parties were not precisely concurrent in point of time, liability may nevertheless be imposed on each where, as here, their several acts of neglect concurred to produce the injury. (See Sanford v State of New York, 94 AD2d 857; Freyer v Gangi, 42 AD2d 832; La Gattuta v Central Hudson Gas & Elec. Corp., 40 AD2d 686; Foiles v Marco, 262 App Div 1024; Hawkes v Goll, 256 App Div 940, affd 281 NY 808.)
*606 Here, the State contributed to causing the accident and it should be held liable. (See Thompson v Korn, 48 AD2d 1007.) It is irrelevant that the defendant did not cause the motorcycle to initially leave the highway. (See Kirchner v State of New York, 223 App Div 543, 546; 26 NY Jur, Highways, Streets, and Bridges, § 373, p 569.)
Nor is liability dependent upon the foreseeability of this particular occurrence. It is only required that an injury be foreseeable by a negligent act. (Robert v United States Shipping Bd. Emergency Fleet Corp., 240 NY 474, 476-477; Condran v Park & Tilford, 213 NY 341, 345; see, also, Hoggard v Otis Elevator Co., 52 Misc 2d 704, affd 28 AD2d 1207.)
Based on Mr. Dattoma’s testimony that he had seen this condition for many years prior, we find that defendant had constructive notice of the defect. This conclusion is buttressed by Officer Lees’ observation that a drop-off is the “normal” condition of the road.
We therefore find the State liable for its negligent maintenance of the highway shoulder.[7]
Evidence was introduced at trial to the effect that Ms. Penzell was wearing a defective helmet which significantly contributed to her death. In this regard, Dr. Donald Jason, the medical examiner who performed the autopsy upon decedent, testified. He had conducted approximately 2,500 such procedures in the course of his career, dozens involving motorcycle fatalities.
Dr. Jason stated that the cause of death was a comminuted fracture of the skull with tears and lacerations of the brain occurring when deceased was thrown from the motorcycle and landed on the back of her head. He said such injuries were anomalous to a situation in which a helmet is worn. He based his observation on the fact that in all the autopsies he has performed relating to motorcycle accidents, where the deceased was wearing a helmet, the portion of the skull it covered was free of injury.
*607 This was not the case here. The absence of a broken neck indicates that the amount of force with which Ms. Penzell hit the pavement should not have fractured her skull, providing the helmet had properly protected her on impact. The lack of serious injury to the rest of her body on which there appeared merely bruises and abrasions buttresses Dr. Jason's conclusion that the decedent died as a result of defective safety equipment.
Assuming we accept Dr. Jason’s opinion, what effect does this have on claimant’s recovery? The situation is somewhat analogous to cases involving the use of another vehicle safety device, seat belts. In Spier v Barker (35 NY2d 444), the Court of Appeals held that the nonuse of an available seat belt is relevant to the issue of mitigation of damages, not contributory negligence.[8] (Spier v Barker, supra, p 451.) The court however left open the possibility that, where failure to use a seat belt is a cause of an accident, such conduct may be germane to the question of liability. (Spier v Barker, supra, p 451, n 3; see, also, Curry v Moser, 89 AD2d 1.)
In the instant case, decedent’s use of a defective helmet did not cause the accident. Rather, it exacerbated her injuries. Therefore her actions are pertinent to the issue of mitigation.
Defendant has the burden of proof in this regard. (Spier v Barker, supra, p 453; Davis v Davis, 49 AD2d 1024.) It must show that decedent failed to act reasonably. (Spier v Barker, supra, p 451; see Prosser, Law of Torts [4th ed], pp 423-424; Developments in New York Law — Plaintiff’s Failure to Use Available Seatbelt May be Considered as Evidence of Contributory Negligence When the Nonuse Allegedly Causes the Accident, 57 St. John’s L Rev 430, 434.)
The defendant has not met its burden. This conclusion might be different if Ms. Penzell was not wearing a helmet. However, she was in fact employing one, provided for her by Mr. Dattoma, a man with 10 years’ experience operating motorcycles. Ironically, June 20, 1980 was the only time decedent had ridden on this type of vehicle.
*608 Decedent acted reasonably in relying on this helmet. There were no notorious defects observable upon it which would have put her on notice that it was dangerous. Although there were staples placed on the inside by Mr. Dattoma as “modifications,” their presence could not reasonably apprise a person such as Ms. Penzell that a hazardous condition existed.
Assuming that the question is one of comparative fault (cf. Gutelle v City of New York, 55 NY2d 794, 796) defendant again has not met its burden. (CPLR 1412.) There was no proof that decedent’s use of the helmet was anything but reasonable.
Thus even if we were to accept Dr. Jason’s opinion, we would not reduce claimant’s recovery under either the theory of mitigation of damages or comparative fault.
The autopsy revealed the presence of .06% alcohol in decedent’s brain. Traces of THC metabolites were also disclosed by the autopsy. Dr. Jason stated that this latter finding indicates that decedent had smoked marihuana sometime within seven days prior to the accident. The toxicological report also noted the presence of an antihistamine which could have caused drowsiness.
We find that Ms. Penzell was not in an impaired state which contributed to her injuries. (See Vehicle and Traffic Law, § 1195.) Since we have concluded that there is no other evidence of fault, her estate’s award will not be reduced as a result of any culpable conduct on her part.
Both of decedent’s parents testified. Her father, Murray Penzell, stated that she was in good health, that she lived at home and that she helped with household chores such as shopping, cleaning and preparing meals. She had been attending night classes at Nassau Community College on an irregular basis. She was also a generous gift giver. This description was substantially corroborated by decedent’s mother, Ruth Penzell.
We find that claimant suffered pecuniary loss of $100,000 as a result of the death of Beth Susan Penzell. (See EPTL 5-4.3; Brookman v Public Serv. Tire Corp., 86 AD2d 591; cf. Rowan v County of Nassau, 91 AD2d 608.) Funeral costs were $2,320. Total recoverable damages therefore equal $102,320.
*609 In granting a recovery we are required to reduce any award by any settlement entered into with a joint tortfeasor or by that party’s equitable share of damages, whichever is greater. (CPLR 4533-b; General Obligations Law, § 15-108; Tabone v State of New York, 116 Misc 2d 864, 872-873; see Siegel, NY Prac, § 176, p 217, n 2; McLaughlin, Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 7B, CPLR 4533-b, p 305; see, also, Green, G.O.L. Section 15-108 — An Unsettling Law, NYLJ, March 3, 1983, p 1, col 2.)
We have held that Mr. Dattoma contributed to the cause of this accident. An action brought against him by claimant in the Supreme Court was settled for $47,500. However, in considering the relative culpabilities of the defendant and the released tort-feasor, we find the State’s equitable share of fault to be 20% while Mr. Dattoma’s to be 80%. We base this on his negligent inattentiveness which caused him to leave the road, precipitating the chain of events that led directly to Ms. Penzell’s death.[9] However, since the State’s negligence in allowing the presence of the impediment actually triggered the occurrence, it cannot be totally absolved from liability.
Since Mr. Dattoma’s equitable share of fault exceeds the amount of the settlement of the action against him, damages must be reduced by the former sum.
Upon the foregoing, we award claimant $20,464 for all damages sustained as a result of the accident of June 20, 1980.[10] Appropriate interest is also awarded from that date. (EPTL 5-4.3.) The foregoing constitutes the decision of this court pursuant to CPLR 4213. Although proposed findings of fact and conclusions of law were submitted by the parties, there is no requirement under current law to specifically pass on these requests. (See Harbor Assoc. v *610 Asheroff, 57 Misc 2d 1016, affd on other grounds 35 AD2d 667; 4 Weinstein-Korn-Miller, NY Civ Prac, par 4213.02.)

. Ocean Drive was also referred to as Ocean Parkway at trial. The former designation is used in the New York State Police investigation report prepared as a result of the accident.

. Although there was testimony that the median was approximately 30 feet wide, we accept as correct the observation of a 60-foot width made by Inspector Robert F. Algar of the New York State Police.

. There are 5,280 feet in a mile. A vehicle traveling at 50 miles an hour will cover 264,000 feet in that time. At the same speed, 73.33 feet will be traveled in one second. (1264,000 feet — 60 minutes] -4- 60 seconds.) Therefore it will take 4.21 seconds to move 309 feet at the rate of 50 miles per hour (309 feet h- 73.33 feet per second).

. The handlebars of the motorcycle were bent as a result of the accident. Various lights on the vehicle were also broken. No other damage was sustained.

. The State’s expert, Frederick H. Zurmuhlen, testified, inter alla, that the accident was caused by the sudden change in direction when Mr. Dattoma turned to regain the pavement. We reject this opinion, (see PJI 1:90.)

. We note that assuming, arguendo, Mr. Dattoma’s nonemergency use of the median would bar a claim instituted by him, such conduct, even if negligent, cannot provide the State with a defense in an action brought by the estate of his passenger. (Protzman v State of New York, 80 AD2d 719, affd 56 NY2d 821; Retzel v State of New York, 94 Misc 2d 562.)

. Since this is a death case, claimant has not been “held to as high a degree of proof of the cause of action as where an injured [claimant] can himself describe the occurrence”. (Noseworthy v City of New York, 298 NY 76, 80; see Wingerter v State of New York, 58 NY2d 848.)

. The cause of action in Spier v Barker (35 NY2d 444) arose prior to Sept. 1, 1975, the effective date of comparative fault. (CPLR 1413.)

. No evidence was introduced which tended to show the precise nature of the alleged defect in the helmet. Neither violation of the appropriate regulations nor departure from good safety standards was demonstrated. (See 15 NYCRR 54.3 et seq.) In addition, no proof was offered which established that Mr. Dattoma knew or should have known of any potential hazard. Absent these factors, it would be purely speculative to ascribe fault to Mr. Dattoma for giving decedent the equipment to use. (See Retzel v State of New York, 94 Misc 2d 562, 568.)

. ($102,3201.2