■ HARDELE REALTY CORPORATION, Appellant, v STATE OF NEW YORK, Respondent.—In an eminent domain proceeding, the claimant Hardele Realty Corporation appeals on the ground of inadequacy from a judgment of the Court of Claims (Lengyel, J.), dated September 6, 1984, which awarded it the principal sum of $45,000 plus stated interest.

Ordered that the judgment is modified, by increasing the award from the principal sum of $45,000 to the principal sum

of $60,000. As so modified, the judgment is affirmed, with costs to the claimant, and the matter is remitted to the Court of Claims for entry of an appropriate amended judgment.

The claimant Hardele Realty Corporation contends that the $45,000 award should be increased to $98,000. It is asserted that in view of the total of $110,000 previously paid for the two lots constituting the subject parcel, a $98,000 valuation (per the claimant's appraisal) is required by the rule of law that "the purchase price set in the course of an arm's length transaction of recent vintage, if not explained away as abnormal in any fashion, is evidence of the 'highest rank' to determine the true value of the property at that time" *(Plaza Hotel Assoc. v Wellington Assoc.,* 37 NY2d 273, 277). The claimant contends that the trial court's decision violates that rule and that the $45,000 award is inadequate.

The subject property (known as 2 Franklin Street, Spring Valley, New York) is shown on the Town of Ramapo tax rolls as section SV, lots 661 and 662. By eminent domain, the State acquired the property in its entirety on January 29, 1981.

Lot 661 had been purchased by Harry Fischer in 1972 for $35,000. On that 1972 acquisition date Mr. Fischer transferred lot 661 to the claimant for no consideration. The $35,000 purchase was financed by a bank mortgage in that amount. A small commercial building on lot 661 was demolished by the grantee after the sale.

Lot 662, which is improved with a building, was acquired by the claimant in early 1975. The claimant's appraiser reported that the indicated acquisition consideration was $75,000. The State's appraiser reported that the sale price was "$100,000", including a "second mortgage * * * of $25,000".

Mr. Fischer had died prior to trial, and no principal of the claimant testified. Although the record is somewhat unclear with respect to the 1975 purchase of lot 662, mortgage instruments in evidence show that the claimant financed the purchase of lot 662 by executing an $85,000 mortgage "as collateral for an indebtedness of Hardele Realty Corp. and Monsey-Valley Taxi Co., Inc." incurred pursuant to a Small Business Administration loan. The claimant appears to have used $50,000 of the $85,000 mortgage loan proceeds for the purchase of lot 662 and to have given a $25,000 purchase-money second mortgage for the remaining balance of the $75,000 purchase price of lot 662.

The trial court noted in its decision that "the indicated prices paid for this debt plastered real estate was not a fair

indication of market value in 1972 and 1975". However, the claimant argues that since the property was purchased for a total of $110,000 ($35,000 for lot 661 and $75,000 for lot 662), it was worth $98,000 on the January 29, 1981 appropriation date, and that the financing of those purchases is irrelevant.

The location, neighborhood and zoning of the property bear upon its valuation. At the time lot 662 was acquired in 1975 it was improved with a one-story and full basement brick commercial building formerly used for a sheet metal and plumbing and heating business. This building had been constructed about 50 to 60 years prior to the State's acquisition of the property in this condemnation proceeding. The claimant used the improved lot 662 (purchased in 1975), together with lot 661 (purchased in 1972) for a taxi service business. However, after Mr. Fischer died, the property was left vacant until the January 29, 1981 appropriation.

The property is situated in a district designated "R-2, Second Residence District" but the commercial (taxi service) use was a lawful, nonconforming use. The property is located one block east of Main Street, Spring Valley, and the report of the claimant's appraisal expert noted that: "Whereas Rockland County, on the whole, has experienced rapid growth, the 'downtown' business core of Spring Valley has suffered a corresponding decline. The Main Street retail corridor, which is approximately 6 to 7 blocks long, is characterized by small, fifty year or older commercial buildings containing retail stores and offices. Competition from major shopping centers along Route 59 and from major shopping centers in nearby Westchester County and New Jersey, has resulted in a decline in business and an increase in vacancies for the older downtown shopping districts, such as Spring Valley, which contain no major department store".

The State's appraisal expert however indicated that the property was located in a "secondary commercial type" location and that: "The general real estate market, especially as to properties of subject's type, age and condition in downtown Spring Valley is static. While there is a degree of real estate activity in the general area, it appears confined to locations more suburban to the Village; i.e., along Route 59 and in the suburbs north of the Village. There are no indications of any increase in demand and it is our judgment that, as respects subject, the market may be best defined as static".

He further testified that there had been a "deterioration of Spring Valley, not only the central core, but, obviously, to a more advanced degree the secondary locations, of which this is

of that type. Over the passage of time from the original purchase back in '72, there had been an acceleration of this deterioration tendency". He therefore concluded that the purchase price of the property did not represent the fair market value as of the date of the appropriation.

The claimant's appraiser used a market data approach and valued the property at $98,000. To derive that value he used four sales of "comparable" properties, made adjustments to the sales prices and concluded therefrom that the value of the subject's 4,914 square feet gross of rentable area (2,457 square feet for main level of building, and 2,457 square feet for the basement level) was $20 per square foot, for a total of $98,000.

The first of his four comparables was the $75,000 purchase price paid by the claimant in 1975 for the lot 662 portion of the subject. He reported that this represented a base unit value of $15.26 per square foot of building area, adjusted upward for time to $17.54.

The second of his four comparables was a two-story commercial building whose $70,000 sale price allegedly showed a base unit value of $21.54 per square foot of building area. The trial testimony disclosed however that this $70,000 sales price *also* included consideration for the sale of an ongoing business, but the claimant's expert had not known that fact.

The third of the claimant's expert's four sales comparables was a parcel improved with a garage building. At trial, however, it was elicited that the sale parcel was *also* improved with a dwelling house but that claimant's expert had not known this.

The claimant's fourth sales comparable was zoned "PLI, Planned Light Industry" and was a corner property. It was located on a State road, and was across the street from a large apartment complex and close to a strip shopping center, whereas the subject of this condemnation was not considered to be on a corner property, was not on a State road and was a legal nonconforming use in a residential zone. The claimant's adjustment for this difference in location was a 10% downward adjustment. The trial court concluded that this 10% adjustment was "totally inadequate", although it gave this sale some weight.

The State's appraisal expert used three whole-to-whole market sales and two land sales to support his indicated value of $35,000. Although the trial court afforded the State's expert's sales data "substantial weight", it also properly criticized his comparable sale "A" and was critical of this appraisal in certain other limited respects.

Faced with the range of value between the State's $35,000 figure and the claimant's request for a $98,000 award, the court concluded that the fair and reasonable market value before the total appropriation was $45,000 and that claimant had been damaged in that amount.

The claimant argues that the only sale which should have been considered was the $110,000 sale to the claimant of the subject property. As previously noted, the $110,000 figure is the sum of the 1972 sale price of lot 661 for $35,000 and the 1975 sale price of lot 662 for $75,000. The 1972 purchase of lot 661 by Harry Fischer (the claimant's principal) for $35,000 was mentioned in the report of the claimant's expert, but was not even listed as one of the four comparables listed by the expert. Rather, it was the 1975 sale for $75,000 of lot 662 that he utilized, along with three other comparables which have been implicitly abandoned in the claimant's argument on appeal.

However, at trial, the claimant had utilized the $75,000 sale in 1975 of the lot 662 portion of the subject and the three other now "abandoned" comparables to derive a total damage claim of $98,000, the amount sought on this appeal. Further, the 4,914-square-foot multiplier was itself the inflated result of treating the basement's 2,457 square feet as equally rentable with the main floor's 2,457 square feet, thus doubling the rentable floor area of the building based upon a questionable assumption.

Moreover, the $35,000 sale of lot 661 occurred nine years before the 1981 acquisition by the State and the 1975 sale of lot 662 occurred six years before the taking. There was also strong evidence that the area was in a state of decline and deterioration. Further, the commercial use of the property, though legal, was a nonconforming use in a residential zone, a factor which a commercial buyer might treat as an adverse factor in determining the value of the property.

Thus, although the claimant criticizes the legal propriety of the trial court's decision that "the indicated prices paid for this debt plastered real estate was not a fair indication of market value in 1972 and 1975", the court's rejection of those 1972 and 1975 sales of the subject was manifestly and primarily based upon considerable evidence and factors totally independent of the manner by which the 1972 and 1975 sales purchases were financed. While a recent sale of property made at arm's length, if not explained away as abnormal in any fashion, is evidence of the "highest rank" to determine the

true value of the property at that time, "it is by no means necessarily determinative of the issue of the market value of real property. The court may properly take into account * * * other factors" *(Matter of Kings Mayflower v Finance Administrator of City of N. Y.,* 63 AD2d 970). At bar, the 1972 and 1975 sales need not be automatically accepted for valuation purposes as recent sales, in view of the deteriorating condition of the general area.

Nevertheless, the trial court's decision to award the claimant $45,000 does not give sufficient weight to the fact that the property had originally been purchased for a total of $110,000. An award of $60,000 would be both within the range of the evidence and is necessary and appropriate to afford just compensation for this taking. Accordingly, the award should be modified upward to $60,000. Bracken, J. P., Lawrence, Eiber and Kooper, JJ., concur.