OPINION OF THE COURT
Gerard M. Weisberg, J.
The issue before the court is the fair market value for the *803 use and occupancy of the land and building known as No. 2641 Grand Concourse, Bronx, New York, during the period from October 22, 1981 through January 5, 1982.
The property covers an entire square block and is located at the corner of Grand Concourse and Kingsbridge Road in the north Bronx. It is improved with an "L”-shaped four-story and basement building having approximately 62,000 square feet of rentable area. The subject also has about 38,000 square feet of exterior, fenced land. It is zoned R-8 (residential) but is surrounded by commercially zoned properties.
Claimant rented the premises to the City of New York (City) for the benefit of the Board of Higher Education. The lease, dated April 30, 1971, was for 10 years and provided the tenant with an option to extend the term for an additional 5 years. The "base rental” was $439,000 per annum for the initial period and $252,000 per annum if the option were exercised. The lease also called for additional rent equal to the real estate taxes in excess of $45,000 per annum, which amounted to $98,200 in 1981.
The agreement required claimant, at its expense, to alter the building from a home for the blind into an educational facility. The specifications were annexed to and incorporated into the lease which provided that if claimant failed to complete the alterations the City could perform them and deduct the cost from the rent. Claimant performed the alterations which cost approximately $1,000,000, and Herbert H. Lehman College (Lehman College), a senior college, took possession.
During the term of the lease, by operation of law (Education Law § 6228 [5], eff July 1, 1979 [see, L 1979, ch 305, § 10]), the master tenancy changed from the Board of Higher Education to City University of New York (CUNY), thereby vesting this court with jurisdiction over this matter pursuant to Education Law § 6224.
In 1980, CUNY decided not to renew the lease and so notified claimant. That notwithstanding, on or about January 12, 1981, CUNY sublet the subject on a rent-free basis to the Board of Education of the City of New York which converted it to an annex to Public School 46. During the 1980-1981 school year it was used by approximately 350 grade-school children. Certain offices in the building were also occupied with the City’s consent by various school boards and municipal agencies.
In early 1981, claimant entered into negotiations with Alex *804 Liberman, chief negotiator for the Bureau of Leasing of the Department of General Services, on behalf of the City, to either purchase or rent the subject. Claimant knew the Board of Education continued to need the premises as an annex to Public School 46.
As of July 1981, the negotiations had progressed to the point where a resolution was drafted for the Board of Estimate seeking the Board’s permission to enter into a one-year lease of the building. The proposed rent was to be $450,000 per annum with the City to pay all real estate taxes and utilities. The resolution was accompanied by a transmittal report, prepared by Mr. Liberman for the signature of his superior, Leonard Kahn, Assistant Commissioner of General Services. Although the report noted the former rent, it failed to mention the cost of the renovations or the lower rent which would have become effective had the option to renew been exercised.
By resolution dated July 23, 1981, the Board of Estimate authorized the Board of Education to enter into the proposed lease. However, the resolution omitted the statutorily required finding that the proposed rent was "fair and reasonable”. (See, Administrative Code of City of New York § 3-406.) For reasons which do not appear in the record, the Department of General Services refused to prepare or execute this lease.
The original lease expired by its own terms on October 21, 1981. While Lehman College had vacated the premises, CU-NY’s subtenants remained in possession. Claimant commenced eviction proceedings which were rendered moot on January 6, 1982 when the City took title by condemnation. No rent or tax reimbursements have been paid by or on behalf of CUNY subsequent to October 21, 1981. By an order pursuant to Court of Claims Act § 10 (6) (2641 Concourse Co. v City Univ., Ct Cl, Oct. 14, 1983, Amann, J.), claimant was permitted to file a late claim which it did on December 1, 1983. Damages are sought from CUNY and Lehman College[1] for such holdover covering the period from October 22, 1981 through January 5, 1982.
The law is clear, and CUNY does not dispute, that its failure to remove its undertenants at the expiration of the *805 lease has rendered it liable for the reasonable value of the use and occupancy for the entire premises for the holdover period together with incidental damages which are attendant thereto. (Stahl Assocs. Co. v Mapes, 111 AD2d 626; Beacway Operating Corp. v Concert Arts Socy., 123 Misc 2d 452; see also, Matter of Jaroslow v Lehigh Val. R. R. Co., 23 NY2d 991; 1 Rasch, New York Landlord and Tenant — Summary Proceedings § 281 [2d ed 1971].) Such value and damages are, therefore, the sole issue before us.
The landlord has the burden of proving its damages including the reasonable value of use and occupancy. (Beacway Operating Corp. v Concert Arts Socy., supra, at 453; Mercurius v Burke, 21 Misc 2d 201.) Reasonable value is fair market rental and may be established by appraisal testimony based on comparable rentals or by reference to the rental history of the subject itself. (New York Connecting R. R. Co. v Queens Used Auto Parts, 298 NY 830; Goelet v National Sur. Co., 249 NY 287; Earl v Nalley, 273 App Div 451; Beacway Operating Corp. v Concert Arts Socy., supra, at 454; Rand Prods. Co. v Mintz, 69 Misc 2d 1055, affd 72 Misc 2d 621; see also, Merman v The Surrey, 106 Misc 2d 941.)
In the analogous area of condemnation valuation, the rule is that a price set in the course of an arm’s length transaction involving the subject, of a recent vintage, if not explained away as abnormal, is evidence of the highest rank in determining the true value of the property. (Plaza Hotel Assocs. v Wellington Assocs., 37 NY2d 273; Vasile v State of New York, 30 AD2d 1042, affd without opn 24 NY2d 969; Hardele Realty Corp. v State of New York, 125 AD2d 543.) In holdover proceedings, this rule finds its expression in the caveat that while probative of fair market rental, the rent reserved in a lease is not conclusive on such issue. (Goelet v National Sur. Co., supra, at 295; Beacway Operating Corp. v Concert Arts Socy., supra, at 453.) Whether a distinction exists between these formulations is a question which need not detain us for, as shall be seen, the rental history of the subject is the only competent evidence of valuation in this case.
Claimant’s appraiser relied exclusively on three comparables located in the south Bronx. Based on that area being "blighted” and a "jungle”, he adjusted his "Rental One” up by 70% and his "Rental Two” and "Rental Three” up by 50% for location. "Rental Two” and "Rental Three” were also modified up by 15% because of their proximity to an "elevated sub *806 way”. After other adjustments, the net changes to the three comparables totaled 80%, 70% and 65%, respectively.
Claimant’s appraiser offered no evidence to support the location adjustments other than his opinion bolstered by his general experience.
Based on these comparables, he opined that the fair market rental was $527,000 per annum on an "absolutely net” basis. Absolutely net was defined to be an arrangement whereby the tenant pays, in addition to the rent, all real estate taxes and utilities.
We find that we can give no weight to this appraisal. To be probative, an opinion must be based on facts properly before the court. (Caton v Doug Urban Constr. Co., 65 NY2d 909; Matter of Chrysler Realty Corp. v Foley, 74 AD2d 847, appeal dismissed 50 NY2d 928; Ridgeway Assocs. v State of New York, 32 AD2d 851; Roskin Bros. v State of New York, 5 Misc 2d 929, affd on other grounds 8 AD2d 895.) Here, the massive location adjustments were offered on a "take it” or "leave it” basis without any corroborative or objective support. That the south Bronx may have been a jungle in 1981 does not, ipso facto, establish that properties in the north Bronx rented for 50% to 75% more. We are forced to either accept that, for example, "Rental One” must be adjusted up by 75% to make it comparable with the subject, or not accept it. But nothing has been submitted upon which we can evaluate this opinion or reach a middle ground.
We are told that claimant’s appraiser was forced to rely on these three comparables because they were the only properties in The Bronx being rented for school purposes and, therefore, were the only ones qualified for comparison. Whether true or not,[2] such reason does not change the result. The primary consideration in selecting comparables is the comparisons profitably to be drawn therefrom. (Lawyers Co-Op. Publ. Co. v State of New York, 47 AD2d 122, affd 39 NY2d 760.) Inasmuch as the appraisal value of a comparable varies inversely with the size of the adjustment required, surface similarities prove illusory where, as here, massive adjustments are required. Whatever the reason, once adjustments reach the level employed here, the transactions cease to be comparable thereby losing their evidentiary weight. (Supra; Latham Holding Co. v *807 State of New York, 16 NY2d 41; Dipson Realty Co. v State of New York, 39 AD2d 636; see also, Yonkers City Post No. 1666 v Josanth Realty Corp., 67 NY2d 1029.) Thus, assuming, arguendo, the adjustments were justified, those very adjustments deny the comparables any probative value.[3]
CUNY’s appraiser relied on 9 comparables, one of which, " # 7”, was the same as claimant’s "Rental One”. Based on these comparables, he concluded that the fair market rental was $268,000 also on a net basis.[4] As with claimant’s appraisal, we find we can give no weight to defendant’s comparables.
The major problem with defendant’s appraiser’s analysis is that he failed to adjust his comparables for actual real estate taxes. The real rent a landlord receives obviously is the sum of, among other things, the rent reserved in the lease and the tenant’s obligation to pay or reimburse for taxes. To say a comparable is renting for a particular sum is meaningless without also stating how much the taxes are and who is paying them. You cannot compare rents without knowing what they actually are. (Cf., Waldenmaier v State of New York, 33 AD2d 75; Svoboda v State of New York, 28 AD2d 1056; Parisi v State of New York, 62 Misc 2d 378.)
In addition, his lack of familiarity with The Bronx rendered his location adjustments suspect. On cross-examination, it became apparent that he failed to have such basic knowledge as the location of the "Hub”, a prime commercial area in The Bronx. (Gold Cup Farms v State of New York, 26 AD2d 770.)
Claimant also asserts that CUNY impermissibly valued the subject as if it were a commercial office building notwithstanding such use would violate its present zoning.
Despite defendant’s appraiser’s apparent concession on this point on cross-examination, it does not appear that he valued the subject on such basis.[5] His valuation was predicated on 9 *808 comparables, six of which were with the same type of municipally affiliated tenants as were claimant’s comparables and which would not violate the subject’s zoning.
We do note, however, that defendant’s comparables "# 1”, ”# 4”, and "# 6” do appear to involve commercial uses which would be violative of the subject’s zoning. In light of our decision to reject defendant’s appraisal, we do not pursue the question of what adjustments, if any, such facts mandate.
Thus, the only competent evidence before us is the rental history of the subject. (Diocese of Buffalo v McCarthy, 91 AD2d 213, lv denied 59 NY2d 605.) Based thereon, three possible values suggest themselves: (1) the rent reserved in the lease; (2) the rent which would have gone into effect during the holdover period if the option to renew had been exercised; or (3) the rent which had been preliminarily negotiated and authorized by the Board of Estimate, but not consummated.
The issue before us is the fair market rental of the subject during the holdover period. In other words, what a tenant desiring but not compelled to rent would pay to a landlord who desires but is not compelled to lease. (Beacway Operating Corp. v Concert Arts Socy., 123 Misc 2d 452, 454, supra). Prima facie, we think the option rent is to be preferred over the expired rent. As between these two numbers, the lease itself tells us what the parties determined to be the appropriate consideration for the subject during the holdover period, to wit, the option rent.* [6]
That the premises were renting for more prior thereto has little relevance. If such higher rent were appropriate or commercially justified presumably it would have been continued or reflected in the option. If the actual market rent were $439,000, why would claimant have agreed to a renewal rent of $252,000? What justifies our disregarding the unambiguous *809 declaration of what the parties believed the market rent to be?
In the face of such questions, claimant has submitted nothing. Moreover, the correctness of our conclusion is corroborated by the fact that claimant was obligated under the lease to make approximately $1,000,000 in structural modifications to adapt the building for school purposes. Thus, the difference between the original and renewal rents is easily explained. The former included a sum sufficient to reimburse claimant for some or all of the construction work; the latter is the actual rent.
That brings us to the issue of what, if any, weight is to be accorded the 1981 Board of Estimate resolution. In other words, does this more recent although unconsummated pronouncement undermine the evidentiary weight to be given to a rent fixed 10 years earlier? Or was its creation and unexplained disaffirmance so unusual as to render it bereft of probative value? We think the latter.
Once the option to renew had expired,[7] the City had no choice but to purchase, lease or otherwise acquire the subject on whatever terms were available. Several hundred school children were enrolled in and therefore depending upon the subject. Claimant was fully aware of the City’s predicament. Thus, the proposed transaction appears to have been negotiated on less than an arm’s length basis. Claimant was in the driver’s seat and knew it. (Cf., Woolworth Co. v Srogi, 92 AD2d 736.)
Moreover, the circumstances surrounding the adoption of the Board of Estimate resolution render it suspect as well. The proposed lease was for only one year, an abnormally short period for a school lease. The report to the Board was misleading in failing to inform that the prior rent was the result of $1,000,000 in alterations and that the lease could have been renewed for substantially less than the $439,000 prior rent. The resolution itself was defective in omitting the statutorily required finding that the proposed rental was "fair and reasonable”. (See, Administrative Code § 3-406.)
Claimant objects to what it characterizes as a "collateral attack” on the resolution. While the resolution is invalid based on its omission of a statutorily mandated finding (cf., Maidgold Assocs. v City of New York, 64 NY2d 1121; 120 Bay *810 St. Realty Corp. v City of New York, 44 NY2d 907; Bermont Operating Co. v City of New York, 128 Misc 2d 653), we need not rest our decision solely on such ruling. Ultimately, the resolution’s evidentiary value is a function of the reason for its abandonment. Why did the City refuse to enter into the lease? Was it because the rent was too high? Or some other reason? Neither side produced the man most likely to know, Alex Liberman, presumably because he is in Federal prison. (See, 2641 Concourse Co. v City Univ., 135 Misc 2d 464.) In the absence of an explanation, we must rely on those particulars of the proposed transaction which are available to evaluate what, if any, weight to ascribe to it. In other words, in examining its creation, we may discover the antecedents of its rejection. We are unconvinced that this abortive and suspect scenario casts any light on the true value of the subject. (Cf., Farash v Smith, 59 NY2d 952.)
Claimant relies on Seeger Studios v 45 W. 45th St. Co. (NYLJ, Sept. 3, 1986, at 7, col 2, affd 131 AD2d 984). We find it to be inapplicable. In that case, there was nothing to indicate that the parties had unequal bargaining positions. More importantly, the court used the higher negotiated rent in fixing use and occupancy because it both benefited the landlord while being consistent with tenant’s theory that a lease had been entered into at such rent. Neither side could therefore be prejudiced by this choice regardless of why the deal fell through. Here the reason is crucial, yet unexplained.
Thus, we find the fair market rental to be as stated in the expired lease if it had been renewed, to wit, $252,000 per annum, plus $98,200 in real estate tax reimbursements through December 31, 1981. This results in $71,573 in damages calculated as follows:
[($252,000 + 98,200) -4- 365 days/year] X 71 days[8] =$68,120.95 $252,000 -4- 365 days/year X 5 days[9] = 3,452.05
$71,573.00
together with statutory interest from November 28, 1981 until May 28, 1982 and from December 1, 1983 to the date of this decision. (CPLR 5001 [b]; Court of Claims Act § 19 [1]; General Construction Law § 30; Kachian v Aronson, 123 Misc 2d 743.)
*811 The foregoing constitutes the decision of this court pursuant to CPLR 4213. Although proposed findings of fact and conclusions of law were submitted by the parties, there is no requirement under current law to specifically pass on these requests. (Penzell v State of New York, 120 Misc 2d 600, 609.)

. Lehman College is an improper defendant in this court. While section 6224 of the Education Law vests this court with jurisdiction with respect to claims against CUNY predicated on the acts of its senior colleges, there is no jurisdiction in this court with respect to the individual institutions which comprise CUNY. The claim against Lehman College is therefore dismissed.

. This conclusion was in fact impeached by defendant’s introduction of four additional leases for school facilities which were apparently overlooked by claimant’s appraiser.

. There were other problems with claimant’s appraisal. For example, "Rental One” was a 10-year lease commencing in September 1982. It provided for rent at the rate of $4.28 per square foot for the first 5 years, $4.75 for the next 2 years, and $5.23 for the last 3 years. Without explanation or justification, these figures were averaged notwithstanding that the holdover period was prior to the commencement of this lease.

. He also opined that the $252,000 option rent in the lease confirmed his market analysis.

. CUNY also argues that the subject was appropriately valued as if it were commercially zoned predicated on its being surrounded by commercially zoned properties and that claimant marketed it on such basis. Neither contention is correct. Claimant’s advertisements provided "[The building] *808 can easily be adapted for use as a nursing home, non-profit office center, institution, or even as a community of rental or condominium apartments.” This is consistent with its R-8 classification and would, therefore, not have required a zoning change. Moreover, while an appraisal can take into account demonstrably likely zoning changes, the correct procedure, not employed here, is to value the subject as presently zoned and then add a premium for the projected change. (See, e.g., Levin v State of New York, 13 NY2d 87; Papovitch v State of New York, 37 Misc 2d 994; see also, Yennock v State of New York, 23 AD2d 809.)

. Although the lease speaks as of 1971, the date of its execution, we note that claimant’s appraiser relied on comparable rentals commencing in 1970 and 1971 ("Rental Two” and "Rental Three”) which he felt required no adjustment for time.

. No evidence was submitted as to why the lease was not renewed.

. October 22, 1981 through December 31, 1981, inclusive, yields 71 days.

. No evidence was introduced concerning the 1982 taxes. Assuming they were the same as in 1981, on January 5, 1982, less than $45,000 would have been imposed against the subject. Therefore, no additional rent would have accrued under the terms of the lease.