opinion of the court
Robert D. Lippmann, J.
This case is before this court pursuant to the order of Judge Lewis Friedman who in his judgment of December 30, 1983, stated that the matter should be referred to the Civil Court for a determination of the value of use and occupancy and the duration of stay of eviction, if any.
Petitioner is the owner of the Beacon Theater located at Broadway and 75th Street, New York City. Respondents, Concert Arts Society, Inc., the tenant, and 50/50 Productions, Inc., the undertenant, have made no rental payments since October, 1982. Upon notice of termination duly served by petitioner, respondents’ tenancy came to an end November 3, 1982. The notice of termination notwithstanding, respondents remained in possession. It is, therefore, our task to assign a value on the use and occupancy of the demised premises from November 3, 1982, to the date when warrant of eviction shall be effective.
*453 By a lease dated January 17, 1977, respondent Concert Arts became the tenant of the Beacon Theater as of February 1,1977, for a term terminating January 31,1987, with option to renew for an additional term of five years.
LIABILITY FOR USE AND OCCUPANCY
It is well settled that a holdover tenant retaining possession is liable for use and occupancy of the premises for the period during which the tenant is in possession. (Luchina Realty v Flatchner, 180 NYS 732 [App Term, 1st Dept]; Carol Mgt. Corp. v Ketchum, Macloed & Grove, NYLJ, June 3, 1981, p 6, col 1 [App Term, 1st Dept].) RPAPL 749 (subd 3) provides the petitioner with the right to collect the amount payable at the time the summary proceeding was commenced and the reasonable value of use and occupancy to the time when warrant is issued.
VALUATION OF USE AND OCCUPANCY
In coming to a determination of the value of use and occupancy, the “rent reserved under the lease is not conclusive, although it is certainly of some probative value”. (Carol Mgt. Corp. v Ketchum, Macloed & Grove, supra, p 6, col 2.) As the court stated in Peoples Trust Co. v Schultz Novelty & Sporting Goods Co. (244 NY 14,18), “[Liability for use and occupation is not liability for rent under the lease. The force of the agreement sued on ends when the lease terminates and if the defendant has effectively terminated the lease a recovery may not be had on the agreement after that date.” Under RPAPL 749 (subd 3), the amount owed the petitioner is a “reasonable value of the use and occupation”. It is the landlord who has the burden of proving reasonable value of use and occupancy. (Mercurius v Burke, 190 NYS2d 826.)
In discharging that burden, the landlord may rely upon the testimony of an expert witness. The qualifications of a witness as to property value “need not be very great”. (Broward Nat. Bank v Starzec, 30 AD2d 603, 604.) Petitioner’s expert witness, Mr. Mike Lerner, is a real estate broker who is regularly involved in the leasing of property in the Upper West Side, the area in which the Beacon Theater is located. According to Mr. Lerner’s credible testimony, Shopwell Supermarket made an offer to rent *454 the premises in question at a monthly rent of $28,500. There was a comparable offer made by Chirpin Chicken, an enterprise engaged in the fast food restaurant business. About these offers I shall have more to say later.
WHAT IS REASONABLE VALUE?
Reasonable value is fair market value, that is, the amount in cash which a willing purchaser would pay and a willing seller would take. (Sparkill Realty Corp. v State of New York, 254 App Div 78.) In Sparkill, the court took up the issue of fair market value of property in the context of a condemnation proceeding in which the State of New York had exercised its power of eminent domain. In determining fair compensation by the State, courts hold that the fair market value is to be based on “the most advantageous use” to which the land could be put. (See, also, County of Niagara v Donohue, 35 AD2d 286; Hewitt v State of New York, 18 AD2d 1128; Matter of City of New York [Shorefront High School — Rudnick], 25 NY2d 146.)
A fair market value standard is as applicable in leasing property as it is in a purchase and sale transaction of real property. The use to which property can be put is surely a factor considered by the prudent buyer and seller in arriving at a price to which both parties agree. However, I do not think in assessing the fair market rental value of the Beacon Theater that the “most advantageous use” standard held to be applicable against the State of New York in condemnation actions is controlling in a holdover proceeding between private parties. This is not to say, however, that limitations on use are outside our consideration. On the contrary, “[a]ll the facts and circumstances which a buyer and seller would consider in connection with the purchase and sale of a piece of property are relevant and material in arriving at a determination as to its market value.” (Sparkill Realty Corp. v State of New York, 254 App Div 78, 82, affd 279 NY 656, supra.)
Thus, we must consider what effect the landmark preservation designation on the Beacon Theater has on its rental value. It must be noted that this designation does not apply, as in the more usual case, to the exterior of the building, but rather to the interior, comprising of the ticket booth, the lobbies, the staircases and staircase railings, the *455 orchestra pit, the stage and its wings, the balcony and loges, the ceilings, skylight, fixtures, and walls, floor surfaces, chandeliers, the rotunda, the murals, panels, doors, sculptures and statues, all of which are an amalgam of lavish and exotic architectural and decorating styles.
As a result of the landmark designation, the interior cannot be altered without a certificate of appropriateness issued by the Landmark Preservation Commission. “Ordinarily a legally imposed restriction on the use of land is a factor properly to be taken into account in fixing its value”. (Ruth v S.Z.B. Corp., 2 Misc 2d 631, 635.) Since the interior was designed as a theater and appointed and decorated for this purpose, the use of the premises cannot easily be converted to accommodate a full range of commercial enterprises and activities, not, that is, without drastically changing the interior and consequently violating the strictures of the Landmark Preservation Commission, whose purpose it is to safeguard for the public and the future landmarks of historic, social and aesthetic significance. We heard Mr. Halbrouck of the Landmark Preservation Commission testify to the scope of the landmark designation in the interior of the theater. It is evident that the uses to which the Beacon Theater can be put are restricted. “That valuations of land must take into consideration all encumbrances thereon, including restrictions as to its use, unless there is a clear provision to the contrary, is well settled”. (Plaza Hotel Assoc. v Wellington Assoc., 55 Misc 2d 483, 487.) Certainly, the full panoply of spectacles can cross the Beacon stage, but I have serious reservations as to the feasibility of a conversion of the theater into a supermarket or a fast food restaurant. Although Shopwell confirmed its offer as late as January, 1984, according to Mr. Lerner’s testimony, and was aware of the landmark designation and thus of the limitation on use of the Beacon space, no evidence was offered to show that Shopwell or Chirpin Chicken had made an application for a certificate of appropriateness. While I do not say that it is not possible to convert the Beacon into a supermarket or a restaurant, yet I am very skeptical, in the absence of proof, that such a conversion would not seriously damage the integrity of the interior designated a landmark. Accordingly, I give little *456 weight to the Shopwell and Chirpin Chicken offers in my determination of reasonable use and occupancy compensation.
Mrs. Kazuko Hilly er of the Concert Arts Society testified that during the summer of 1983 she rented the theater for use as a theater to independent promoters for $2,500 a day on weekends. At eight weekend days per month, this amounts to $20,000 per month. I believe this to be a reliable guide to the fair market rental value of the theater for theatrical functions. There is, in addition, documentary evidence that on several occasions Mrs. Hilly er rented the theater at higher rates. Furthermore, she was also able to rent the theater to artists for weekday performances. Therefore, if anything, a use and occupancy rate of $20,000 per month is on the conservative side. The designation of the theater as a historical landmark will, perhaps, enhance its rental value for use as a theater, but without more, it would be speculation on my part.
I therefore hold that the following amounts are due by respondents Concert Arts Society and 50/50 Productions to petitioner Beacway.
1) November 1 and November 2, 1982 Rent based on the lease:
$7,393.55 pro rated for two days $ 486.24
2) July. 1983 through February, 1984
We take the rental rate Mrs. Hilly er actually charged as our measure of fair market value: $20,000 for eight months 160,000.00
3) November 3,1982 (termination date of lease) through June, 1983
Since rental value in New York City increases with time, I will not apply the $20,000 rate retroactively. I believe that by averaging the monthly rent reserved under the lease in 1982 ($7,393.55) and the rent actually charged by respondent in the summer of 1983 ($20,000), we arrive at an equitable use and occupancy rate for this period. The figure comes to $13,696.77, which we round out to $13,700 per month.
*457 December, 1982 — June, 1983 95,900.00
November 3 — November 30 (pro rated) 12.786.48
Total $269,172.72'
To the sum obtained must be added the amount owed by respondents for water charges for October, 1982 through January, 1984.
1.608.00
$270,780.72
There is in addition a real estate tax charge owed by respondents. It is not included in the computation here because the precise amount owed is not before me. However respondents are liable for this charge.
A stay of three months is granted respondents on condition that they pay one third of the above amount, namely $90,260.24 each month, plus current use and occupancy of $20,000 per month and a one-third portion of the real estate taxes. The first installment is to be paid within 10 days of the time that this judgment is served on the respondents’ attorneys, thereafter on the first of the month.