OSI LLC v Balaskonis (2025 NY Slip Op 51066(U))

[*1]

OSI LLC v Balaskonis

2025 NY Slip Op 51066(U)

Decided on July 2, 2025

Civil Court Of The City Of New York, New York County

Stoller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 2, 2025
Civil Court of the City of New York, New York County

OSI LLC, Petitioner,

against
Asimina Balaskonis, et al., Respondent.

Index No. 81441/2018

For Petitioner: Gabriel Levy
For Respondent: Kevin Spikes

Jack Stoller, J.

OSI LLC, the petitioner in this proceeding ("Petitioner"), prevailed at both trial and at appeal in its cause of action for possession of 454 West 47th Street, Apt. 3E, New York, New York ("the subject premises") against Asimina Balaskonis ("Respondent"), a respondent in this proceeding, and Anastasios Kritikos ("Co-Respondent"), another respondent in this proceeding (collectively, "Respondents") on the basis that Respondents are rent-controlled tenants who did not maintain the subject premises as their nonprimary residence. By an order dated June 8, 2023, the Court granted Petitioner's motion for a judgment in fair market use and occupancy to the extent of finding that Petitioner was entitled to a judgment representing the difference between the use and occupancy that Respondents paid and the fair market rent from December 1, 2018 through the date of surrender at a rate to be determined at a hearing. The Court held a hearing on November 16, 2023, April 16, 2024, February 24, 2025, and May 14, 2025, and adjourned for submission of post-trial memorandums to May 28, 2025.
The record on the hearing
The parties stipulated that Respondents surrendered possession of the subject premises on March 31, 2023.
Talma Grafi ("the Property Manager") testified that the subject premises has between one and two bedrooms because a second room does not have a window; that when you walk into the subject premises straight across is a living room; that there is a kitchen to the right; that there is another part of the kitchen; that the bathroom is to the right; that to the left there is a small room and a huge bedroom facing the front of the building in which the subject premises is located ("the Building"); that Petitioner updated paint and light fixtures in the subject premises after getting possession; that Petitioner rented the subject premises for $3,500 three months after gaining possession; that the HPD guide is a guide for fair market value for New York City; that it uses data from past rentals to determine the fair market value by room count to assess the value; that she uses that document; that she is an experienced broker; that she checks the comparables before renting; that Respondents used the subject premises as a two-bedroom; that [*2]the subject premises has 700 square feet; that she knows Respondents; that Respondents made payments; that 4R and 1R are comparable units in the Building; that apartment 1R rents for $3,500; that apartment 4R rents for $3,000; that in 2018 and 2019 it was $3,100; that she manages a building on the same block on the same side of the street as the Building; that in 2018 and 2019 she rented 2W at 428 West 47th Street for $3200 in 2018; that she rented 2E at the other building $2,800 in 2018 because it was not an updated unit; and that 4R was rented for between $3,000 and $3,100.
The Property Manager testified on cross-examination that she cannot recall if the second bedroom of apartment 1R has a window; that apartment 1R at the Building is legally a two-bedroom apartment; that the subject premises is legally a one-bedroom; that apartment 4R at the Building is legally considered a two-bedroom; that all the apartments are about the same size; that 2W is also about the same size but maybe slightly smaller; that she guessed that 2W is a legal two-bedroom; that 2W is not a railroad apartment; that 2E may be a "one-flex" because the second room does not have a window; that the subject premises has had the same layout since she has been managing it; that 4R in the Building is not the same layout; that 4R is not a railroad apartment; that she did not do any major renovations to the subject premises after Respondents vacated; that she had to get a new refrigerator; and that some walls needed plaster and paint and light fixtures were replaced in the subject premises after Respondents vacated.
The Property Manager testified on redirect examination that the apartments in the other building are about 700 square feet; that the flex bedroom in the subject premises is pretty big; that they are bigger than both of the other rooms in the apartments; that the others can fit two king beds; that some bedrooms cannot fit a queen or a full mattress; that the flex bedroom did not compromise living room space; and that the master bedroom in the subject premises is bigger than the master bedrooms in the other apartments.
Sofia Corradini ("Petitioner's First Realtor") testified that she has been a licensed real estate salesperson since 2012; that she has been at a company for four years now and she worked for two prior companies; that she worked in real estate for the last eleven years; that she represents landlords and tenants; that she closes between 150-200 transactions a year; that she used to live in Hell's Kitchen; that she has done a lot of rentals there over the years; that she is being paid $300 an hour to be here.
The Court granted Petitioner's application to qualify Petitioner's First Realtor as an expert witness.
Petitioner's First Realtor testified that she listed the subject premises; that her client's moving date was too far away and the landlord got a tenant with an earlier date; that she saw the subject premises and took photos of it; that she listed the subject premises; that she inspect the subject premises in June of 2023; that there is a massive king size bedroom high ceiling, facing a quiet tree lined street; that there are hardwood floors; that there are modern light fixtures and a living room and an open kitchen with a window and stainless steel features; that there are two bedrooms in the subject premises; that it is a legal one-bedroom flex two; that this unit would be listed as a two-bedroom; that she would guess it is 650 square feet; that she looks at comparable apartments to determine the market rate; that she cross-verifies with StreetEasy; that a comparable apartment has to be in a walk-up building; that she considers location, bedroom size, and bathroom size; that she determined that $3500 was the fair market value because her database showed that similar listings that were rented and she checked StreetEasy; that she looked for both one- and two-bedrooms; that the subject premises would be a two-bedroom; that [*3]the prices in the report are rented prices; that they have to include the rented price; that it is required to put out the rented price to close out the listing; that the Elliman report gives specific pricing; that StreetEasy sometimes looks for the listing agreement; that comparable units were from $3300 to $3500; that they look at hundreds of apartments; that it is not an exact science; that the Elliman report shows average price per neighborhood; that reports like this are common in the industry; that Elliman is a large firm and a publicly-traded company; that Elliman report is a basis to look at a rough estimate of what a neighborhood could be; that she rented two apartments on 47th Street, 1E and 4W; that she has seen a few units in the Building; that the units are generally comparable because they are floor-throughs with high ceilings and two rooms; that the building on the block is similar; that she is roughly familiar with the HPD Fair Market Rent (FMR) guide; that 2018 was a very strong market; that the market changed after 2019; that the time of the year could change the value from $3300 to $3500; that now it could be higher $3500 to $3700; that a lot of people returned from being out of the City after Covid; that the different measures are the same; that the subject premises has a more desirable layout then a typical "two-flex" because of the size of the rooms and the light in the living room; that she included Apt. 2A at 412 W 49th Street because it is a similar size as the subject premises; that that apartment rented for $3550; that she included an apartment on 47th Street, almost the same block, which rented for $3295; that she included Apt. 2S at 642 10th Ave., located on the second floor like the subject premises, which had comparable size and amenities and they use the same criteria to compare units; that this was same location street-wise; that the rent was $3272 in 2019; that the average was $3380; that as years go by rents go up, based on twenty-plus properties; that the average would be about $3380; that in 2024 that rent would be $4000, that in 2019 it would be about $3380; that in 2020 it would be about $100 more, to wit, $3480; that she would not use 2020 because it was a weird year; that in 2021 it would be about $3600; that rent can go up $100 a year minimum; that in 2022 to 2023 rent would go up, so that the market value would be $3380 2018, $3480 2019, $3500 and $3600 for following two years, and could be $3700 by 2023.
Petitioner's First Realtor testified on cross-examination that in 2020 how much rents changed depended on locations; that it was a very atypical year; that her report is just between 2018 and 2019; that in some properties rents went up in 2020; that apartments with outdoor spaces or with a home office it could be more valuable; that she rented apartments in the Times Square area; that she rented 60 apartments in 2020; that the rental market took a sharp decline during the pandemic; that none of the units in her reports have elevators; that some of them are renovated; that some of them have washers and dryers; that she is not aware of HPD violations in rentals; that she is unaware of the effect of a DOB violation on the value; that she has been to the subject premises, but not in 2018; that she was there in 2023 after Respondents vacated; that right after Respondents moved she saw the condition of the subject premises; and that the subject premises is a one-bedroom flexible two, that there is a door for the second bedroom, that you have to enter the second bedroom through the first bedroom, and that's why it is a flexible two-bedroom.
Colton Traynham ("Petitioner's Second Realtor") testified that he has had a license in real estate since 2016; that he has continued education requirements; that he works for Marcus and Millchat as a licensed real estate salesperson; that he worked for Rino realty group; that he has been involved with $60 million; that he has generational owners and private investors; that he is experienced with sales, and had over ten sales; that he has experience in Hell's Kitchen; that he was paid $300/hour for advisory on the value of the property.
The Court granted Petitioner's application to qualify Petitioner's Second Realtor as an expert witness.
Petitioner's Second Realtor testified that he looks at market rents and legal rents from the perspective of an investor; that he generates net operating income and then he considers rate as determined by lending institutions or banks; that a property analysis report is what building is worth and why in that specific market and how buildings compare to similar buildings in the neighbors and rents compared with market rent; that he provides information to owners so owners can decide whether to sell; and that he prepared a report for the Building.
Petitioner's Second Realtor testified that the market value of the subject premises is $3,200; that when they project market rents, he considers size of the units and price per square foot, the monthly rent times 12 months divided by the square footage; that the generational owner of 689 10th Avenue hired him to sell the building, which was sold at the end of 2019; that he assessed the property value of that building and took into account the rents that were achieved; that the building had 7 two-bedroom apartments and one studio; that he saw the units; that 6 of the units were 650 square feet; that one was 750 square feet; that the Building had no amenities; that the apartments rented from $3200 to $3700 a month; that he knew that from leases obtained by the seller; that that those units are comparable in size and location to the subject premises; that most of them are 650 square feet; that the level of renovation in the units affected the rent; that the subject premises would rent for 60 per square foot, that he has been to the subject premises, which is 600 square feet with two bedrooms on the third floor; that the subject premises would rent for $3200 in 2018 and $3600 in 2019; and that rents in the neighborhood have increased such that it would be at least $3600 at the time he testified.
Petitioner submitted into evidence documents for a building on Tenth Avenue showing rents there are around $3,200. Petitioner's Second Realtor testified that he takes expenses into account. Petitioner submitted into evidence documentation of an apartment at 439-443 West 48th Street, with a 350 square-foot apartment that rented at $3,400 and a 690 square foot apartment that rented for $2850.
Petitioner's Second Realtor testified that a building with a rent-controlled tenant can lead to a $1 million difference in valuation of a building, which he shows through comparing similar buildings; that there was a loss due to the tenant failing to vacate before 2019 because HSTPA revoked deregulation; that the subject premises would have been deregulated before June 24, 2019; and that this led to a loss of a million dollars because of the loss of the ability to deregulate.
Petitioner's Second Realtor testified on cross-examination that he is aware of a how a rent is calculated when a rent-controlled tenant vacates; that before 2019 you could charge a market rent but you had to issue a rent-stabilized lease; that when a unit became stabilized you still had to pass the threshold to deregulate; that both before and after 2019 you could set a market rent, but the difference is that now the rent is stabilized; that the rent could have been $3200 a month if the tenant had timely moved out; that after the pandemic, the market increased beyond what it had before; that the pandemic did not affect every unit in New York; that it affected rents for people who lived in New York; that rental rates declined because of the pandemic; that he has seen the subject premises; that he would call the subject premises a true two-bedroom apartment; that the two bedrooms are separate entities; that the bedrooms have two separate entrances; that the two-bedrooms in the 10th Avenue building are true two-bedrooms; that his projections are based on square footage, so a railroad apartment does not diminish the price; that he did not see [*4]the subject premises in 2019 or 2020; that he saw the subject premises only in March of 2024; that Respondents moved out in July of 2022; that his valuation would not change if the subject premises was not renovated; that he factors in a renovation budget; that there was a washer and dryer in the subject premises when he viewed it; that he did not know if that was there when Respondents moved out; that he does not consider violations; that he specializes in 107th Street and below; that he knows StreetEasy; that StreetEasy is a platform to rent an apartment; that owners or agents list properties on StreetEasy; that he does not rely on StreetEasy; that he relies on leases and documentation; that a tax bill has below-grade square footage; that he visits every line of the buildings that he values; that he considers square footage per floor with a loss factor, particularly if the units are the same size; and that they sometimes get floor plans.
Petitioner's Second Realtor testified on redirect examination that there are experiences where a building in Manhattan did not decline during the pandemic.
Petitioner submitted into evidence a rent breakdown showing that after December 1, 2018 Petitioner received four payments of $155.25 and forty-seven payments of $160.25. The Property Manager testified that there was a rent freeze that gave them a $5 credit; that rent was frozen because a previous manager did not file DHCR paperwork to lift the rent freeze; and that the prior landlord fixed the conditions numerous times.
The Property Manager testified on Respondents' case that she knows the subject premises; that the subject premises is a railroad apartment; that she is familiar with the condition of the subject premises during the time that arrears are sought; that the subject premises was in good condition; that Respondents did the work on the subject premises in 2016 before she started as a property manager; that Petitioner did repairs but not updates; that the subject premises had a washer, dryer, and light fixtures installed; that Respondents replaced a floor with a wood floor and did electric work; that the cabinets seemed to be new; that the Building has 15 apartments; that the other apartments are similar in size and the 5 units in particular on the "E" line are identical; that there are rent-stabilized apartments in the "E" line; that one rents at about $3200, another one rents at $2900 and another one rents at almost $2900; that the subject premises is now rented for $3605; that another unit is in the low $2000s, but it was old and was not updated; that there is a harassment proceeding; that she was only aware of complaints about the subject premises through HPD; that Petitioner could not get access; that she got complaints about paint, plaster, window guard, floor tile, and a water leak; that there were tons of leaks; that there was flooding that would come from that apartment or affect apartments underneath; that the value of the subject premises ranged from $3200 to $3600; that she has been a broker and salesperson for about ten years; that she knows the market value that way; that she has been to the subject premises a few times; that the walls of the subject premises were plaster; that the subject premises was used as a two-bedroom apartment; that the subject premises is about 650 square feet, divided into a kitchen, bathroom, living room, and bedrooms; that the bathroom had a tub; that she manages another building a few buildings down from the subject premises; that the apartments in the other building are about the same size as the subject premises; that the apartments rent for a range; that she does not know what the rents are, but they are "the high threes"; that Petitioner did work in 4E similar to what was done for the subject premises; that she first got access to the subject premises in January of 2018; that she was aware of lead paint in the subject premises in 2018; that they had to take care of it a few times; that Petitioner had a lot of problems getting access; that the actual repair was done quickly; that the subject premises was marketed by one of the brokers who testified; that she did not remember how long the subject [*5]premises was on the market; that the same tenant still occupies the subject premises; that the lease for it was rent-stabilized; that there was one leak that affected the subject premises; that she did not remember where it was; that there were two leaks; that she asked for access on October 9, 2017; that she retained a company to perform work at the building in 2018 or 2019; that stairs were not removed from the Building; that stairs were replaced; that one thread would be removed and then another would be replaced; that stairs were in use; that this was in August of 2017; that this process took a month or two; that permits were obtained; that there were electrical upgrades throughout the building in 2017; that there was a lead remediation in the subject premises between 2018 and 2022; that the current tenant of the subject premises is "Eran Itay" ("the Current Tenant"); that the Current Tenant applied for the subject premises from a listing; that the subject premises rented for $3,500; that she is not familiar with websites about hotels; that she was last in the subject premises a month after Respondent left; and that minor work was done in the subject premises.
Respondents submitted into evidence a decision after trial dated July 11, 2024 of a harassment petition that Respondent and other residents of the Building had commenced against Petitioner and the Property Manager ("the Harassment Decision"), captioned at Katz and Balaskonis v. OSI LLC, TGM Services Corp, and Talma Grafi, Index # L/T 300675/2021 (Civ. Ct. NY Co.). The Harassment Decision found, inter alia, that Petitioner indeed engaged in harassment of Respondent, noting along the way violations for lead in the subject premises from 2018 through March of 2021. The Harassment Decision, inter alia, entered a violation for harassment, enjoined Petitioner from engaging in harassment, fined Petitioner $1,000 for the subject premises, and restored the matter for a hearing on an award of legal fees for Respondent and the other petitioners in that case.
Respondent testified that she was born in the subject premises and she lived there until March of 2023; that the monthly rent that her parents paid and that she continued to pay was $160.25; that the subject premises was rent-controlled; that there was building-wide construction in 2017 until 2023; that for over a year they did not have proper stairs, but wood all over the place and planks; that the stairs were demolished; that she would hold on for dear life when she went up the stairs; that when she was pregnant with her second son her husband would not allow her to carry her first son up the stairs because he was afraid that she would fall; that this condition went to 2018; that in 2019 there were no rails on the stairs; that there was lead in the subject premises; that there was constant debris and there were leaks and plumbing problems and electrical issues; that she had to provide access "thousands" of times; that Petitioner wanted access all the time; that there was a leak from the roof that damaged the ceilings and stairs of the common areas down to the third floor; that the common area was affected in 2021; that the condition probably lasted for more than a month; that the wall was completely torn off by the entryway from the time construction began in 2017 through 2020; that from 2018 until the end of February of 2019 was when they first repaired the lead damage, which took two weeks; that the lead remediator said that Respondent could live in the subject premises during the remediation; that they covered the bed and the ceiling; that she did not remain in the subject premises during the remediation; that there was scaffolding; that she could not open the kitchen window because there was debris; that there was no natural light where there was scaffolding, from 2018 through 2022; that she had to have the blinds down because there was construction material in the back; that if she opened the window the kitchen would get dirty and there would be no privacy because workers were there; that there was electrical work for four years; that [*6]Petitioner requested access for four years; that there were leaks; that there were electric and plumbing issues; that that there was a breaker put into the subject premises; that this went on in 2020 and 2021; that the toilet was broken; that there was a leak from the kitchen sink; that there were issues with window guards; that in 2019 there was a leak from her toilet to the apartment downstairs which required access; and that Petitioner destroyed her entryway and exposed brick when repairing a leak from above.
Respondent submitted into evidence advertising for the subject premises as for short-term rentals; a registration of the subject premises with the New York State Division of Housing and Community Renewal ("DHCR") erroneously classifying the subject premises as Rent-Stabilized.
Respondent submitted into evidence photographs of the common areas of the Building, including a fire escape and photographs inside the subject premises which depict an apartment in poor condition, including discoloration in paint on a window and a damp spot in a bedroom ceiling.
Respondent submitted into evidence emails from Petitioner dated November 13, 2018, November 17, 2019, and July 20, 2020 showing that Petitioner wanted access to remedy leaks, lead, bathroom floor tiles, and the toilet.
Respondent submitted into evidence violations placed with the New York City Department of Buildings ("DOB") for construction.
Respondent testified on cross-examination that she could not give precise dates as to the photographs; that she did not email Petitioner about the issues because Petitioner was constantly reaching out to her and because she had an attorney and issues were being worked out with her attorney; that scaffolding blocked windows in the kitchen and in the front of the building; that she reported conditions to HPD; that she did not personally install cabinets; that she did not replace the toilet; that she did not remember if she installed a washer/dryer; and that she paid the super to replace tiles in the subject premises.
Respondent testified on redirect examination that she notified her attorney about conditions in the subject premises; that she only wanted her attorney to communicate with Petitioner; and that Petitioner would fix something and then an issue would come up.
Selma Allsop ("Respondent's Realtor") testified that she is a licensed real estate broker; that she has worked for fifteen years; that she was also a franchise owner of brokerages and a managing agent; that she reviewed DHCR and HPD and BIS records for the subject premises; that she reviewed StreetEasy records; that she reviewed real estate licensing and codes; that the subject premises is a one-bedroom walk-up on the third floor in a building with no amenities; that the photographs that she has seen show that it has been unrenovated in Hell's Kitchen and had no elevator; that the subject premises is 675 square feet; that she saw HPD violations dating as far back as 2010; that there were lead paint violations from 2019 through 2022 when it was remedied as well as structural issues with the Building; that when she has to assess the most value that a landlord can receive from an apartment being rented according to the market at that time, unrenovated walk up buildings in Hell's Kitchen in 2019 ranged from $1800 to $2300 based off of reported rents on StreetEasy; that when she did the full comparison, it included habitability; that a reasonable landlord would have to disclose the lead paint condition, which would take 30% off of the fair market value; that she calculated being $1,400 to $1,750 being the value for the subject premises from 2019; that a railroad-style apartment would rent for $2,100 in 2019, and a 30% habitability reduction would make the rent $1,470; that in 2023 the fair market value would be $2,200, and the habitability discount in 2023 would be a 30% deduction, [*7]making the rent $1,540; that she saw DHCR records; that in 2017, Petitioner reported a rent-stabilized rent of $155.25; that Petitioner reported a rent of $3,500 would be highly unlikely because it was unrenovated and a third-floor walkup with no amenities; that comparable rents for the time show less than that; that she also used Douglas Elliman market repots; and that between 2020 to 2022 the market had drastic reductions because of Covid.
Respondent's Realtor testified that the pandemic affected her fair market calculations; that one of the rooms does not have a window so that subject premises would not qualify as a two-bedroom apartment; and that there were violations and stop work orders during the pandemic.
Respondent's Realtor testified on cross-examination that she does not show apartments herself, maybe 15 or 20 in the last few years; that she manages the brokerage; that she has not rented apartments in Hell's Kitchen; that she has not been to the Building; that she has not testified as an expert; that she is being paid to be here today; that Respondent's counsel is paying her $400 an hour; that she is paid to create an analysis according to the normal scope of her work; that she knew about lead in the subject premises because of an HPD violation in the unit; that she got to $2,100 from comparable rentals; that she looks for other rentals that are in similar condition and what they are offered for; that she averaged 20 units to reach that number; that in 2019 or 2021 406 West 48th Street, Apt. 5RW was a one-bedroom with a fifth-floor walkup that was not a "one-flex", which rented for $2,300; that most units in the area are about the same average price; that she did not know how big the comparable apartment was or when the building was built; that a fifth-floor walkup would reduce the price by $50, but it was fully renovated and had a dishwasher; that in June of 2019, 534 West 50th Street, Apt. 2C rented for $2,200, and did not have additional space; that the highest value comparable apartment she found was $2,800 for an apartment that she did not have an address to; that she arrived at the 30% because of habitability concerns like lead and other HPD violations; that a discount between 15% and 50% applied when the apartment lacked habitability and because of the pandemic; that she would find comparable apartments in the same condition; that prices have bounced back after the pandemic abated; and that Covid affected everyone's rental rate.
Respondent's Realtor testified on redirect examination that she did not find comparable apartments with a 30% deduction because they compare the condition of the unit with comparable apartments and because the agent would have to say that there is lead paint in a listing of a property; that the subject premises is average-sized for the area; that listings don't list square footage, but the number of bedrooms; and that the photographs she viewed affected her decision by about five percent, because the subject premises was occupied for decades and was rent-controlled and unrenovated.
Discussion
A tenant is liable for use and occupancy for the entire holdover period, from the lease expiration through the date of vacatur of the subject premises. 501 East 87th St. Realty Co., LLC v. Ole Pa Enterprises Inc., 304 A.D.2.d 310 (1st Dept. 2003), Beacway Operating Corp. v. Concert Arts Socy, 123 Misc 2d 452 (Civ. Ct. NY Co. 1984), 2641 Concourse Co. v. City University of New York, 137 Misc 2d 802 (Ct. of Claims 1987) aff'd, 147 AD2d 379 (1989). The termination date provided for in a predicate notice is the point at which a property owner's entitlement pivots from rent to fair market use and occupancy. See South St. Ltd. Partnership v. Jade Sea Restaurant, Inc., 187 AD2d 397 (1st Dept. 1992), leave to appeal denied, 81 NY2d 705 (1993), Midway Hotel, Inc. v. Forestal, 21 Misc 3d 137(A)(App. Term 1st Dept. 2008). In this [*8]case, the predicate notice terminated the tenancy on November 30, 2018. The parties stipulated that Respondents surrendered possession of the subject premises on March 31, 2023. Therefore, use and occupancy accrued from December 1, 2018 through March 31, 2023, for a total of 52 months.
Reasonable value is the amount that a willing owner would accept and a willing tenant would pay. 2641 Concourse Co. v. City Univ. of New York, 137 Misc 2d at 808 (Ct. Cl. 1987), aff'd, 147 AD2d 379 (1989), citing Beacway Operating Corp. v. Concert Arts Socy., 123 Misc 2d at 454, Parker 24 Commercial Assoc. v. Sakow, 14 Misc 3d 1231(A)(Civ. Ct. NY Co. 2005), aff'd, 14 Misc 3d 135(A)(App. Term 1st Dept.), leave to appeal denied, 2007 NY App. Div. LEXIS 8678 (1st Dept. 2007). Petitioner bears the burden of proving the reasonable value of use and occupancy. 2641 Concourse Co., supra, 137 Misc 2d at 804-805, which can be established by appraisal testimony based on comparable rentals, T.J. Montana Enters., Inc. v. Centoni, 10 Misc 3d 137(A)(App. Term 1st Dept. 2005), 595 Broadway Assocs. v. Bikman, 2003 NY Slip Op. 51254(U)(App. Term 1st Dept. 2003), leave to appeal denied, 100 NY2d 506 (1st Dept. 2004), 40 W. 55 LLC v. Kurland, 2003 NY Slip Op. 50606(U), at *3 (App. Term 1st Dept.), or by reference to the rental history of the premises itself. See Giorgio Armani Corp. v. SL Green Realty Corp., 2015 NY Slip Op. 31482(U) (S. Ct. NY Co. 2015), Beacway Operating Corp., supra, 123 Misc 2d at 452.
Petitioner's First Realtor valued the subject premises at $3,380 in 2018 and $3,480 in 2019. The rentals she used in her analysis consisted of 54 units in 27 buildings, which made up a total of 56 listings.[FN1]
A compilation of Petitioner's First Realtor's report, with rental amounts ranging anywhere from $2,900 to $4,500 and with an average rent of $3,411:

Building

Unit

Beds

Rooms

Sq. Ft.

Rent

304 West 30th St.

7

2

4

$3,380

19

2

4

$3,990

314 West 51st St.

A

2

4

$3,350

1A

2

4

$3,500

4W

2

5

$3,850

316 West 39th St.

3W

2

4

700

$3,700

4W

2

5

$3,850

[*9]324 West 47th St.

4B

2

4

$3,061

326 West 47th St.

1A

2

4

$3,195

1A

2

4

$2,995

2NE

2

4

$2,979

3A

2

4

$3,195

3B

2

4

$3,295

5B

2

4

$3,295

340 West 49th St.

4NW

2

4

$2,933

344 West 47th St.

5E

1

4

$3,000

349 West 45th St.

3FE

2

4

$2,995

359 West 45th St.

2RS

2

4

$3,500

400 West 47th St.

3D

1

3

$2,950

400 West 56th St.

2A

2

4

$3,795

2E

2

4

$3,000

2G

2

4

$3,495

3A

2

4

$3,850

401 West 45th St.

5D

1

3

$3,500

403 West 49th St.

2

2

5

$3,755

412 West 49th St.

2A

2

5

$3,550

3A

2

5

$3,600

5A

2

4

$4,500

437 West 46th St.

2RW

2

4

$3,095

440 West 45th St.

2E

2

4

$3,000

3W

2

4

700

$3,500

5R

2

4

$3,100

444 West 50th St.

3

2

4

$2,900

494 9th Ave.

B4

2

4

$2,995

506 9th Ave.

3FN

2

4

$3,500

536 9th Ave.

2FN

2

4

$3,500

3F

2

3

750

$3,495

3FN

2

4

$4,000

3FS

2

4

800

$3,495

3FW

2

4

800

$3,500

4FN

2

4

$3,500

640 10th Ave.

2N

2

4

$3,342

2S

2

4

$3,273

642 10th Ave.

2S

2

4

$3,272

3N

2

4

$3,146

691 9th Ave.

2SE

2

4

$3,150

4SS

1

5

$3,400

692 10th Ave.

PHA

2

6

$3,995

747 9th Ave.

2N

2

5

$3,995

749 9th Ave.

204

2

4

$3,375

302

2

7

$3,450

303

2

4

$3,450

305

2

4

$3,375

305

2

5

$3,375

504

2

4

$3,500

793 9th Ave.

4F

2

4

$3,300

Just for a preliminary impression, the report shows inconsistencies which may bring its reliability into question. For example, the report shows two listings for Apartment 305 within the building at 749 9th Ave., which indicates that the unit was leased twice within a three-month period. In 2018, the unit was listed as having 4 rooms. The listing the following year shows a room count of 5.
Setting aside those issues, a cursory review of the "comparable rentals" Petitioner's First Realtor selected raises questions as to how comparable the rentals truly are. Most rentals included in the report lack square footage information. The several units which do include square footage range between 700 to 800 square feet, which is larger than the 650 square feet the witness estimated the subject premises to be. Petitioner's First Realtor stated that some of the units were renovated and some had washers and dryers. The subject premises, by contrast, was unrenovated and lacked a washer or dryer. The identification of Apartment "PHA" in one of the listings shows that the report includes at least one penthouse. A penthouse is an unlikely comparable apartment for a third-floor unrenovated walk-up unit.[FN2]
Finally, while Petitioner's First Realtor testified that the rentals were all close in proximity, the report shows units which [*10]are in different areas with different zip codes.[FN3]
When a property is too different from the subject premises, it ceases to be comparable and loses its evidentiary weight. See 2641 Concourse Co., supra, 137 Misc 2d at 806—07, New York City Economic Dev. Corp. v. Harborside Mini Stor., Inc., 13 Misc 3d 1218(A)(Civ. Ct. NY Co. 2006), East Soho Corp. v. Delancey Live Poultry Inc., 2006 NY Slip Op 50763(U), at *4 (Civ. Ct. NY Co.).
In order to control for any differences between the comparable rentals and the subject premises, a comparison should begin with the rental amount of each comparable rental and then an appropriate upward or downward adjustment would follow to arrive at fair market value. See Matter of City of NY (Shorefront High School), 25 NY2d 146, 148—49 (1969), Latham Holding, Inc. v. State of New York, 16 NY2d 41, 45—46 (1965). Petitioner's First Realtor did not explain what adjustments, if any, were made.
Petitioner's Second Realtor testified that the fair market value of the subject premises in 2018 would be $3,200, based on a market analysis of eight units within the building located at 689 10th Avenue, including 7 two-bedroom apartments and 1 one-bedroom apartment.[FN4]
Rental amounts for the units range from $2,800 to $3,700, as shown below.

Unit

Beds

Sq. Ft.

Rent

1W

1

550

$2,800

1E

2

750

$3,700

2W

2

650

$3,450

2E

2

650

$3,200

3W

2

650

$3,200

3E

2

650

$3,500

4W

2

650

$3,400

4E

2

650

$3,300

Petitioner's Second Realtor testified that all of the units selected are comparable in size and location to the subject premises, which he estimated to be about 600 square feet, and that the [*11]units had the same number of bedrooms. He did not testify to any other comparable features beyond this limited testimony. The 10th Avenue building is a mixed-use building, having one commercial unit on the first floor. Mixed-use buildings may experience noise or sanitation issues stemming from commercial use which are not similarly experienced by tenants in residential buildings, like the Building. Petitioner's Second Realtor expressly stated that his valuation would not change if the subject premises was renovated. The renovation of the subject premises and other comparable apartments is a factor in determining the fair market rent, as all facts and circumstances which a renter would consider are relevant and material in arriving at a determination as to its market value. Beacway Operating Corp., supra, 123 Misc 2d at 454, citing Sparkill Realty Corp. v. State, 254 A.D. 78, 82 (3rd Dept. 1938), affirmed, 279 NY 656 (1938). Finally, Petitioner's Second Realtor's valuation is significantly higher than the rents of the other fair market units within the Building, based on the records he put into evidence.
Respondent's Realtor testified that the fair market value of the subject premises in 2019 would be between $1,400 to $1,750 based upon her review of 20 rental listings she found on StreetEasy.[FN5]
Of the 20 units, Respondent's Realtor made specific reference to just two. Based on the listings, Respondent's Realtor concluded that an apartment in an unrenovated walk-up building in Hell's Kitchen ranged from $1800 to $2300 in 2019. Respondent's Realtor opined that the subject premises should be valued at 30% downward adjustment due to habitability concerns within the Building and subject premises. Unlike Petitioner's witnesses, Respondent's Realtor relied entirely on secondhand information she found on StreetEasy. She did not list the units, verify the rental amounts, or visit any of the units.[FN6]
Respondent's Realtor's failure to establish the reliability of the sources she used undermines any probative value her testimony might have otherwise held. See New York City Econ. Dev. Corp., supra, 13 Misc 3d at 1218(A) (purportedly comparable transactions based on secondhand information from brokers without inspection of leases or rental units is not probative). In addition, Respondents' Realtor did not established without corroborative evidence or objective support for adjustments. 2641 Concourse Co., supra, 137 Misc 2d at 806. [FN7]

"It is almost invariably the case that the value ... is not the figure claimed by either [party] and advanced by their respective experts. The court is not bound to choose between these figures and select one of them based upon an evaluation of the capabilities or the character of the respective experts." Matter of City of New York (Lincoln Sq. Slum Clearance Project), 15 [*12]AD2d 153, 161 (1st Dept. 1961), aff'd 12 NY2d 1086 (1963). Even if only one party presents valid evidence on valuation, the Court need not accept that opinion if it provides a sufficient explanation for its decision and there is other evidence in the record to support the court's determination. Lawyers Co-op. Pub. Co. v. State of New York, 39 NY2d 760 (1976), Manson v. Kejo Enters., LLC, 145 AD3d 994, 995—96 (2nd Dept. 2016), New York City Econ. Dev. Corp., supra, 13 Misc 3d at 1218(A).
In this case, the most probative measure of use and occupancy is the evidence of comparable rentals within the same building. A 2018 rent roll for the Building is in evidence. Petitioner's Second Realtor testified on Petitioner's case that he personally created the rent roll based on the leases provided by the Petitioner which were in effect for each respective unit in 2018. Four of the fifteen units are identified as fair market rentals,[FN8]
having rents from $2,800 to $3,200, with an average rent of $2,963, as shown below.

Unit

Total Rooms

Rent

1E

4

$2,800

2W

4

$2,850

3W

4

$3,000

4R

4

$3,200

The rent roll shows that all four fair market units have the same room count as the subject premises. While the rent roll is silent as to square footage of the units, the Court credits the testimony of the Property Manager that all of the units within the Building are about the same size. The Property Manager testified that Apt. 1E and Apt. 4W in particular are comparable units, and that Apt. 1E is identical to the subject premises. Based on the foregoing, the undisputed rental history of similar units within the same building is a probative measure of the fair market value of the subject premises in 2018, when the damages began to accrue. What remains is how use and occupancy should be adjusted through a subsequent period, given that the evidence of comparable rentals is limited to 2018 and 2019.
In 2024, roughly three months after Respondent vacated, Petitioner was permitted to charge a market rent given that the subject premises had previously been Rent-Controlled. See Liggett v. Lew Realty LLC, 211 A.D.3.d 473, 475 (1st Dept. 2022), appeal dismissed, 39 N.Y.3.d 1092 (2023). Petitioner rented the subject premises for $3,500, thus showing what Petitioner was willing to charge and the Current Tenant was willing to pay, i.e., the market value. 2641 Concourse Co., supra, 137 Misc 2d at 808, citing Beacway Operating Corp., supra, 123 Misc 2d at 454, Parker 24 Commercial Assoc. v. Sakow, 14 Misc 3d 1231(A)(Civ. Ct. NY Co. 2005), aff'd, 14 Misc 3d 135(A)(App. Term 1st Dept.), leave to appeal denied, 2007 NY [*13]App. Div. LEXIS 8678 (1st Dept. 2007).
Petitioner engaged in some minor updates between the time Respondents vacated the subject premises and the time the Current Tenant took occupancy. The unrebutted testimony by Petitioner's witnesses establishes that Petitioner replaced the refrigerator and light fixtures in the subject premises and installed a washer and dryer after regaining possession.[FN9]
The subject premises after these updates sustained an eight percent increase in rental value. Eight percent less than $3,500 is $3,220, which accords with a valuation of the fair market rent at the time Respondents vacated.[FN10]
To get from $2,963 in 2019 to $3,220 in 2023, the fair market valuation would increase by $59.28 per year, or $4.94 monthly.
Respondent argues that there were habitability issues which should entitle Respondents to a downward adjustment of use and occupancy. Respondent points specifically to the hallways, construction and scaffolding, violations, documented lead-based paint hazards, and "compromised common areas", which Respondent alleges persisted throughout the relevant time period from December of 2019 through March of 2023.
Respondents' answer in this proceeding, submitted by their first attorney, did not include a counterclaim for breach of the warranty of habitability. Accordingly, the focus of any inquiry as to the condition of the subject premises is not the extent to which it diminished the habitability of the subject premises, but rather as a factor in determining the market value of use and occupancy in an arms'-length transaction between a landlord and a tenant. 129th St. Cluster Assoc. L.P. v. Levy, 2012 NY Slip Op. 32988(U)(Civ. Ct. NY Co.).
Intuitively, conditions in the common areas of the Building, including the scaffolding that Respondent testified about, would be apparent to tenants of comparable apartments in the Building. Whatever market rents the tenants of those apartments agreed to with Petitioner therefore already price in those conditions.
As far as conditions in the subject premises itself, Respondent mentioned a leak, plumbing problems, and electrical issues in her testimony, but this was too vague in terms of both the problem itself and a time frame to base a discount of the use and occupancy on. The leak in particular appeared to affect the apartment below the subject premises, thus rendering unclear the connection to an amount a tenant would be willing to pay in rent.
Respondent testified about a lead paint issue. The Harassment Decision referenced lead paint violations of the New York City Housing Maintenance Code in the subject premises that lasted from 2018 through March of 2021. To properly weight the effect of lead paint hazards on the market demand to rent the subject premises, the Court must assume that tenants would know about them. Logically, a landlord is much better situated than a prospective tenant to know about lead paint hazards and, indeed, all leases must disclose, inter alia, the obligations of an [*14]owner to investigate for and remediate lead paint. N.Y.C. Admin. Code §27-2056.4(c). However, the same provision of the code requires an owner to remove all lead-based paint from all friction surfaces upon a vacancy of any unit built before 1960. N.Y.C. Admin. Code §§27-2056.8(a)(3) and 27-2056.8(a)(4).[FN11]
An evaluation of the impact of a lead paint hazard on the market rent of the subject premises therefore requires the Court to assume that a landlord would not comply with the statute's requirement to abate lead when an apartment is vacant but also that a landlord would comply with the statute's requirement to disclose that. As Respondent's Realtor testified, such instances are rare enough that comparable rentals are not meaningfully available.
Even if the lack of comparable rentals forces the Court to make an estimate, logically, a lead hazard would reduce the demand for an apartment, particularly among prospective tenants with minor children. Respondent's Realtor testified that the discount would be 30%, although the source of her testimony is not clear. The Court finds that the effect would be at least 20%, which would apply for the time that the violation was in place, from December of 2018 through March of 2021.
Respondent also argues that the Court's finding of harassment in the Harassment Decision decreased the value of the premises. Respondent's reliance on Barash v. Pennsylvania Terminal Real Est. Corp., 26 NY2d 77 (1970) is misplaced. Barash dealt with constructive eviction. There is no such claim here. More importantly, the Court that wrote the Harassment Decision had the power to award compensatory damages. N.Y.C. Admin. Code §27-2115(o). The matter where Respondent litigated her harassment cause of action is the appropriate forum to adjudicate harassment damages, not here. Moreover, Respondent does not establish a connection between a landlord's harassment of tenants and a rental amount that a prospective tenant would pay for an apartment.
Conclusion
Petitioner is entitled to a judgment for fair market use and occupancy as follows.
December 1, 2018 through November 30, 2019: $2,963 x 12 = $35,556, discounted by 20%, leaving $28,444.80
December 1, 2019 through November 30, 2020: $3,022.28 x 12 = $36,269.36, discounted by 20%, leaving $29,015.49
December 1, 2020 through March 31, 2021: $3,081.56 x 4 = $12,326.24, discounted by 20%, leaving $9,860.99.
April 1, 2021 through November 30, 2021: $3,081.56 x 8 = $24,652.48
December 1, 2021 through November 31, 2022: $3,140.84 x 12 = $37,690.08
December 2022: $3,145.78
January 2023: $3,150.27
February 2023: $3,155.21
March 2023: $3,160.15
The total damages from December 1, 2018 through March 31, 2023 is $142,275.25. After crediting payments made in the amount of $7,547.75, the total judgment amount is $134,727.50.
Petitioner is also entitled to prejudgment interest on the use and occupancy at the [*15]statutory rate of nine percent per annum, pursuant to CPLR §5004. See Hugh O'Kane Elec. Co., LLC v. MasTec N. Am., Inc., 45 AD3d 413, 414 (1st Dept. 2007), City of New York v. Elizabeth St., Inc., 82 Misc 3d 1246(A) (Civ. Ct. NY Co. 2024).
Accordingly, it is
ORDERED that Petitioner is entitled to a money judgment in the amount of $134,727.50 against Respondent with post-judgment interest at a rate to be determined by the clerk, and it is 
ORDERED that Respondent is entitled to a separate money judgment in the amount of for pre-judgment interest, at a rate to be determined by the clerk.
This constitutes the decision and order of the Court.
Dated: New York, New York
July 2, 2025
HON. JACK STOLLER, J.H.C.

Footnotes

Footnote 1:Two of the comparables Petitioner's First Realtor used were listed twice in the report.

Footnote 2:See Mushlam, Inc. v. Nazor, 80 AD3d 471, 473 (1st Dept. 2011)(lease for penthouse apartment improperly considered to determine fair market value of another apartment in the building when leases for all other apartments within the building had far lower rents).

Footnote 3:See Eleven Riverside Dr. Corp. v Tax Commn. of the City of NY, 2009 NY Slip. Op 21706(U) (Sup. Ct. NY Co.)(the comparison of residential property with those in a different more than one mile away is significantly disqualifying), Georg Jensen, Inc. v 130 Prince Assoc., LLC, 24 Misc 3d 1217(A) (Sup. Ct. NY Co. 2009), East Soho Corp. v. Delancey Live Poultry Inc., 2006 NY Slip Op 50763(U) (Civ. Ct. NY Co.). The Realtor used two units at 304 West 30th Street, which is in Chelsea, 494 9th Ave., which is in the Garment District.

Footnote 4:The witness referred to the unit as a studio in his testimony, rather than a one-bedroom.

Footnote 5:Respondent's Realtor's comparable rentals included: 406 West 48th Street, Apt. 5RW which, based on Respondent's Realtor's recollection of the listing, was described as a legal one-bedroom (with no flexible second bedroom) in a fifth-floor walk-up, which rented for $2,300 in 2019 or 2021 and 534 West 50th Street, Apt. 2C, which rented for $2,200 in June of 2019.

Footnote 6:As Petitioner noted, at least one of the comparables Respondent's Realtor used was rent stabilized, which raises questions as to the credibility of the remainder of her assessments.

Footnote 7:Notably, Respondents' Realtor was not qualified as an expert witness. The witness' valuations and deductions based on habitability considerations require expertise which extends beyond the observations generally permitted of a fact witness. See Almestica v. Colon, 304 AD2d 508 (2003).

Footnote 8:As the rents of the regulated apartments are not probative as to the fair market value, Weiden v. 926 Park Ave. Corp., 154 AD2d 308 (1st Dept. 1989), the Court's inquiry is limited to units with fair market rents.

Footnote 9:Petitioner's witnesses also testified that they painted and plastered the walls. Painting and plastering is a repair, not an update or improvement, and does not justify any increase in value of the subject premises. 

Footnote 10:The valuation based on rental history is roughly consistent with the HPD 100% Fair Market Rent (FMR) and the 100% Small Area Fair Market Rents (SAFMR), which list the fair market rent within the zip code in 2022 of $3,080 for a one-bedroom unit and $3,510 for a two-bedroom and in 2023 of $3,260 for a one-bedroom unit and $3,680 for a two-bedroom unit.

Footnote 11:As the subject premises has been subject to the Rent Control Law, the Building has to have been built before 1960, as Rent Control applies to housing accommodations built before 1947. N.Y.C. Admin. Code §26-403(h).